**Affirmed and Opinion Filed July 19, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01254-CR**

**ALLEN THOMAS SAMPLE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 196th District Court**
**Hunt County, Texas**
**Trial Court Cause No. 31279**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Carlyle
Opinion by Justice Osborne

A jury convicted Allen Thomas Sample of murder and sentenced him to forty years' imprisonment. Appellant raises three issues on appeal: (1) trial counsel was ineffective for not filing a motion to suppress Appellant's statement made in custodial interrogation when Appellant did not make a knowing and voluntary waiver of his rights, (2) the evidence is insufficient to find beyond a reasonable doubt that Appellant committed murder, and (3) the trial court erred by denying Appellant the right to cross-examine witness Ronnie Sample through proper impeachment evidence. We affirm.

## BACKGROUND

Law enforcement officers responding to a 911 call on May 20, 2016 observed a body on a trash pile on property in Hunt County shared by Appellant and Appellant's brother Ronnie Sample.[1] The body was identified as that of Tommey Joe Tubb, a 47-year-old male who was also living on the property. During a subsequent autopsy, investigators learned that the cause of death was a single gunshot wound to the left side of Tubb's head.

Twenty-four witnesses testified at trial to the events and investigation leading to Appellant's arrest and indictment for Tubb's murder. Fourteen of the witnesses were law enforcement officers or forensic scientists. The remaining witnesses testified about their connections to and communications with Appellant, Ronnie, or Tubb. The jury also heard or watched a number of recordings, including Appellant's recorded interview with law enforcement and several of Appellant's telephone conversations while he was in custody before trial. The State sought to prove that Appellant's behavior became increasingly erratic in the months prior to the murder due to a series of adverse events in Appellant's life and his long-term dependence on hydrocodone. Appellant, in turn, highlighted the lack of physical or forensic evidence linking him to the murder, introduced evidence of law enforcement's admitted mistakes in its investigation, and argued that the evidence better supported

---

[1] For clarity we refer to Allen Sample as "Appellant," and to Appellant's son Jacob Sample and Appellant's brother Ronnie Sample by their first names.

a verdict against Ronnie, who had gunshot residue on his hands the night of the murder and who gave inconsistent statements in his interviews with law enforcement.

The State offered evidence at trial that Appellant and his younger brother Ronnie lived on an eight-acre tract of land in Campbell, Texas. The brothers' residences were separate but located close to each other on the property. Ronnie had known Tubb for about twenty years at the time of Tubb's death. Tubb was living with Ronnie in May 2016 because he had no other place to go; he had a history of drug addiction and homelessness.

For about six years and until the week before the murder, the Sample brothers had worked together at Dooley Plumbing. Appellant, a licensed plumber, earned about $1,000 per week. The brothers' former employer John Dooley described Appellant as "a great guy"—trustworthy and a "great employee"—before a "gradual decline" in the weeks before May 2016. Dooley testified that he received repeated customer complaints about Appellant's work and eventually fired Appellant the week before Tubb's murder, on a morning when "what [Appellant] was saying just didn't make any sense." Appellant "kept saying something about a Martian or something was after him." Ronnie, however, continued to work at Dooley Plumbing.

Ronnie testified that on the date of the murder, he saw Tubb asleep in a chair before leaving for work around 6:00 a.m. Ronnie also explained that when he went to work that morning, there were three mattresses leaning up against the wall at the

front of his house. When Ronnie returned home around 7:30 or 8:00 p.m., he did not see Tubb. On entering his home, he found the house "in shambles." "A big chunk of carpet" was "sliced out of the floor," a shower curtain was missing, and Tubb's cigarettes were "all over the floor around the chair." The three mattresses had been moved to the burn pile in the back.

Ronnie went to Appellant's home to ask about the damage. Appellant said Tubb "walked off a while ago" down the road. Ronnie testified that he did not believe Appellant and started looking for Tubb, but could not find him. Ronnie then went under his truck to fix a rattle. Ronnie also testified, however, that when he asked Appellant about Tubb, Appellant "got mad at me and started screaming and then he started to pull a gun"—a .22 revolver that had been their father's—and Ronnie flipped his knife in response. Ronnie testified that after the argument, Appellant said he was going to burn the mattresses. Ronnie replied that Appellant should not do so because only household trash could be burned. Ronnie started moving the mattresses from the burn pile to the trash trailer to be hauled to the dump later. In doing so, he could see part of the missing shower curtain, a chunk of carpet, and a blanket from his house. He then found Tubb's body.

Ronnie testified that Tubb was in a fetal position and appeared to have been "beat to death." There was a lot of blood, and he did not notice a gunshot wound. He called 911, and as he was doing so, Appellant drove off screaming "I warned them motherfuckers to stop jacking with me, I'd do something." When the police and

ambulance arrived in response to his call, he spoke with them and then stayed on the premises until the police asked him to come to the station to give a statement, which he did.

Ronnie also testified that he called Mike Langran, his stepfather, and told him that Tubb was dead and he thought Appellant killed him. He did so because Appellant had driven off and Ronnie did not know where Appellant was going. Ronnie stated that in May 2016, Appellant was "in good shape" and could "easily" have picked up Tubb and dragged him out to the trash pile. Tubb, in comparison, was not strong or active and had breathing problems.

Ronnie testified that Appellant had not been "acting normal" before the murder, thinking that "people were messing with him," "beating on the doors," recording him through his phone, stealing from him, and stealing his identity. Ronnie also explained that Appellant became addicted to hyrodcodone after a knee operation five years before the murder. At the time of the murder, Appellant was taking Suboxone "to get off the hydrocodone." He also testified that Mandi Northcutt, Appellant's girlfriend, no longer lived with Appellant, and that Appellant was upset that he could no longer see Northcutt's son, B.R.

In the trial court and on appeal, Appellant highlights discrepancies between two interviews Ronnie gave to law enforcement, one on the night of the murder and the other two years later, as well as discrepancies between those interviews and Ronnie's testimony at trial. In his initial interview, Ronnie did not mention that

Appellant tried to pull a gun on him or that he flipped his knife in response. He did not say that Appellant had driven off screaming, but rather only that he "heard [Appellant's] diesel crank up." In his second interview, Ronnie told investigators that Appellant called him at work around noon on the date of the murder, angrily demanding that Ronnie return home to help Appellant get his truck out of the mud in their driveway where it was stuck. Also in the second interview, Ronnie said he did not enter his home when he returned from work, but instead went to ask Appellant about Tubb because he had an "awful feeling," in contrast to his earlier statement that he first found the damage in his home and then went to ask Appellant about it. When officers discussed the test results showing gunshot residue on Ronnie's hands the night of the murder and explained that there would be residue in the house if Tubb had been shot there, Ronnie added a list of objects he had touched in the house in his search for Tubb.

Mandi Northcutt, Appellant's former girlfriend, testified that she and Appellant began dating in 2011 and broke up in late 2015. Northcutt explained that she and Appellant "started having problems" in the last two years of their relationship. She moved out of Appellant's home and returned to her parents' home several times. She explained that Appellant was attached to her son B.R., a child with special needs. When Northcutt broke up with Appellant, however, she "didn't see that it was safe enough for him to see" B.R. because Appellant had changed, "think[ing] that I was doing things that I wasn't doing" and "mak[ing] up these

elaborate stories," "almost just like a switch flipped—you know what I mean?—in his mind or something." But she and Appellant stayed in occasional touch by phone and text message even after she began dating someone else in February 2016.

Northcutt also testified that Appellant used hydrocodone several times a day during their relationship, then "tried to get off of the hydrocodone and he got on Suboxone. And then eventually it was hydrocodone and Suboxone."

Northcutt testified to text messages and phone calls she received from Appellant after the time Tubb's body was found. First, Appellant sent her a text at 1:53 a.m. when she was at work on a night shift, telling her he needed her help. She responded, and Appellant elaborated that he was broke and in a bind. She told him to call her after her shift was over at 7:00 a.m., which he did, telling her that he was going to check himself in at Glen Oaks Hospital. On May 22, Appellant called her from Sundance Hospital.[2] Northcutt testified:

Q. Once he called you from Sundance, what did he talk to you about?

A. Allen [Appellant] had told me that he was sick of him, sick of him stealing from him. And he asked me, Do you know what you do to someone who steals from you?

And I said, No, Allen, what do you do?

And he said, I handled him, I handled it.

---

[2] Both Glen Oaks and Sundance Hospitals are mental health facilities, as is Green Oaks Hospital. The appellate record includes documentation from Sundance and Green Oaks but not from Glen Oaks.

After that conversation, Northcutt did not take further calls from Appellant and gave a statement to police. On cross-examination, Northcutt testified that the police never asked to check her phone to see Appellant's texts or to confirm the time or date of the phone calls she received from him. She confirmed that if she had been asked, she would have shown police her phone. Northcutt also said that Appellant did not name Tubb in their last conversation; she "just assumed he was talking about Tommey."

Mike Langran, Appellant's and Ronnie's stepfather, testified that Appellant came to stay for a few days after he was fired from his job. At the time, Appellant said he was on vacation. Langran testified that Appellant was not acting like he normally acts, staying up almost all night every night and asking if a delivery person was from outer space. Appellant complained to the Langrans that he was supposed to have money on his debit cards but did not; he thought people were stealing from him. Langran also testified that appellant "thought [Tubb] was kind of a freeloader."

After Appellant's visit had concluded, Langran received a phone call from Appellant on May 20. Appellant asked him, "What do you do with a dead critter? I've got a—what do I do with it?" Langran testified he replied "I'd just take him out in the field and burn him." Later the same night, Ronnie called and said Tubb "looked like he was seriously injured." Next, Appellant drove by in his truck and said "I've done a bad thing." Langran replied that he already knew, and advised Appellant to turn himself in. According to Langran, Appellant then "took off." On cross-examination, Langran testified that no one from law enforcement asked to look

at his phone to confirm the time of Appellant's calls. He also described the relationship between Appellant and Ronnie as "pretty hostile" "off and on, especially when they worked together."

Appellant's son Jacob Sample, 28 years old, called his father on or about May 22, 2016, at the suggestion of his stepdad. As Jacob explained on cross-examination, his "intent the entire time, if [Appellant] told you where he was at, to call the police." Appellant told Jacob it had been "a rough couple months." He had been laid off from his job, could not afford gas money, and was sitting on the side of the road with an empty gas tank. Jacob testified that Appellant "said somebody got shot and he doesn't know how it happened." Jacob "thought it was weird that [Appellant] said shot," because no one Jacob had spoken with before the call "mentioned a gun or mentioned being shot." Jacob testified,

> Q. At that point in the conversation, what did you tell your dad to do then?
>
> A. I told him that if he—I got the impression that he thought he wasn't guilty because he said he didn't know how it happened. So I said, If you aren't guilty, then just go back to where you were before and it will all work itself out. And he said he didn't think it would go down like that.

Darlene Jordan, Appellant's acquaintance through his work for Jordan's employer, testified that she had a conversation with Appellant about his breakup with Northcutt. She described Appellant as "very depressed" about the breakup and said that he "missed the little boy." On cross-examination Jordan elaborated that she was worried because Appellant was upset and crying, and this was not his normal

behavior. Jordan "tried to sit and talk to him and asked him maybe if he wanted to go see a doctor and maybe help get some pills or something to help him sort life out"; she also called a friend "who works in a clinic" for advice and then "MHMR," who spoke to Appellant. She overheard him say that he had a gun at home, but not with him.

Appellant's sister Mary Norris testified that she was staying with their mother and stepfather while recovering from leg surgery during the week of Appellant's visit there. Norris described Appellant's "odd behavior" during his visit, "talking about people tapping into his phone and stealing his mail," and coming into her room at night shining a flashlight and saying he was trying to make sure everyone was okay. On cross-examination, Norris acknowledged that Appellant was trying to ensure his family's safety rather than hurt anyone.

Jessica Brock, a detention officer in the Hunt County Sheriff's Department, was working in the intake department on May 29, 2016, and spoke to Appellant. Appellant identified himself to her "as an officer, and I believe it was a CIA agent at first. He was just upset." Appellant continued talking to Brock about "a gentleman that was stealing from him, had maxed out his credit cards." Appellant "kept saying that he was in there for credit cards, and I informed him that, no, he was there on murder, because he didn't understand why he was there. He kept asking me why he was in there." She told him that he was there on a murder charge, not "for credit cards." Appellant then "continued speaking":

He was very agitated, very upset. And he started talking about how he did what he did out of self-defense. Kept referring to a him, never identified anybody, but that he did what he did to him out of self-defense, basically because of his property, his, quote, unquote, shit, as he said, being taken and his credit cards being maxed out.

On cross-examination, Brock testified that Appellant was in an "observation cell," which is "one that is used for medical—severe medical conditions, mental conditions, drug withdrawal. If they're going to be a harm to themselves or others or potential harm to themselves or others." Brock testified that Appellant's statements did not "seem odd" because he was in an observation cell.

The State presented testimony from Stephen Lenfest, M.D., a Dallas County medical examiner, to establish that Tubb's death was caused by a .22 gunshot wound to the head. Lenfest testified that there was no gunshot residue on Tubb's skin:

A.    [W]ith a wound like this, we would be looking at the skin for any gunshot residue or any things we can use to determine range of fire. In this case, there's nothing on the skin like soot or stippling that we would use to do that. Basically with a typical handgun, that would indicate to us that either something was between the firearm and the decedent, the skin of the decedent, or that it was probably outside of three feet.

. . .

Q.    You mean the shot would have been fired from outside of three feet?

A.    That's correct.

Lenfest could not determine an exact time of death. On cross- and redirect examination, he concluded that Tubb probably died between 2:00 p.m. and 10:00 p.m. on May 20:

–11–

Q. So it's 10:00 p.m. to 2:00 p.m. And you would say that you can't say for sure within that range, but based on what you would say, it's probably closer to the 2:00 p.m. time than the 10:00 p.m. time. Is that what I understood?

A. That's what I would expect based on what I see in the autopsy report.

The State also presented evidence that when Ronnie gave his statement to police on the night of the murder, officers swabbed his hands, and subsequent testing revealed the presence of gunshot residue. The State offered testimony from Waleska Castro, a trace evidence examiner for the Southwestern Institute of Forensic Sciences ("SWIFs") with expertise in analysis of evidence for the presence of gunshot residue, to explain the methodology and results of the tests conducted. Castro testified that there were several possible explanations for the presence of gunshot residue on a person's hands:

Q. Okay. And if somebody has gunshot residue on their hand, does that mean they fired a gun?

A. If a person has gunshot residue on their hands, it could be that the person either fired the firearm or the person was in the proximity of the firearm when it was fired, or the person handled or touched anything with gunshot residue, such as a firearm or a firearm component, or any surface with gunshot residue on it.

Castro was unable, however, to determine or to testify which of these alternatives applied in this case.

Four other forensic scientists testified that DNA testing was either impossible or inconclusive in this case. In sum, there was no DNA evidence linking Appellant—or anyone else—to Tubb's murder.

–12–

Five officers from the Hunt County Sheriff's Department testified about their investigation of the murder. Joel Gibson, the initial lead investigator, and Roger Seals, who took over as lead investigator when Gibson left the sheriff's department, both testified, as did Clint Mott, Ren Saxton, and Kelly Phillips, who each participated in some aspect of the investigation. The officers testified to their activities, including obtaining and executing search warrants, interviewing witnesses, obtaining witness statements, collecting evidence at the crime scene, attending Tubb's autopsy, presenting the case to the grand jury, and arresting Appellant. The jury also viewed a videotape of officers at the crime scene the night of the murder. Gibson and Seals testified that Appellant had been in Green Oaks Hospital and Sundance Hospital, mental health facilities, after the murder and was in protective custody and then segregation at the jail due to mental health concerns.

Gibson conceded there were mistakes in the investigation. He acknowledged that investigators did not:

- Attempt to verify Ronnie's statements about the time he left work or his stop for dinner on his way home;

- Secure a complete recording of Ronnie's 911 call;

- Obtain Ronnie's phone to confirm he made the calls he said he did, at the time he said he made them;

- Follow up on information that there were boots with blood on them at Appellant's residence;

- Obtain a warrant and search Appellant's second vehicle;

- Obtain a warrant for tracking information on a cell phone taken from Appellant;

- Record Jacob's statement; or

- Obtain Northcutt's phone to verify times and dates of Appellant's calls and the substance of his text messages.

During the officers' testimony, the jury heard recordings of nine phone conversations between Appellant and others while he was in custody as well as watching a video of Appellant's June 1, 2016 interview with law enforcement. The jail calls included seven calls between Appellant and Ronnie, Appellant's call to a bail bonding company, and a conversation between Appellant and his mother. Appellant highlights portions of these conversations in his brief, including:

- Appellant's statements to Ronnie that "You could be in this motherfucker with me," and "They ain't got shit because I ain't done shit,"

- Appellant's statements to the bail bonds employee that he did not murder anyone and has access to funds to post a $500,000 bond;

- Appellant's statements to his mother that law enforcement tried to get him to confess, but he was not going to confess to something he didn't do; that he didn't do anything wrong; and that Tubb was involved with the Mexican Mafia and Ronnie knew it but was keeping silent.

In the recording of Appellant's June 1, 2016 interview with law enforcement, after Appellant was informed of his right to an attorney, Appellant asked questions about how an attorney would be appointed for him and which attorney he might get, and stated that he had a few attorneys in mind who might represent him. As discussed in more detail below, Appellant also made statements about being switched at birth when he was asked to waive his rights. In the interview, Appellant said multiple

–14–

times that he knew nothing about Tubb's death; he was not angry with Tubb; he did not see Tubb on the day of the murder; his .22 had been stolen some time ago; and he had odd dreams about hunting animals but not a person. Appellant was confronted with Northcutt's, Langran's, and Jacob's statements and offered his own explanations and denials.

The jury returned a verdict of guilty and sentenced Appellant to 40 years in the Texas Department of Criminal Justice Institutional Division. This appeal followed.

## Issue 1: Ineffective Assistance of Counsel

In his first issue, appellant contends that trial counsel was ineffective for not filing a motion to suppress Appellant's statement made in custodial interrogation when Appellant did not make a knowing and voluntary waiver of his rights. Appellant argues:

> When Appellant is shown where to sign if he understands his rights, asked if he wants to waive his rights and wants to speak to law enforcement, Appellant responds, "My thing is, I'm not even sure who I am sometimes. My Mama told me that when I was a baby, they brought her a black baby. They switched it all up. And then she said, 'Well wait a second, my husband is white.' And then they brought me in next. I don't know exactly what's going on." Appellant is literally saying "I don't know exactly what's going on" as he signs his name to the waiver of his rights, clearly raising the question as to whether or not he was [sic] understood what he was doing and raising the issue of whether or not his waiver was knowing and voluntary.

*Ineffective assistance of counsel*

A defendant in a criminal case has a Sixth Amendment right to effective assistance of counsel. U.S. CONST. amends. VI and XIV. It is the function of effective trial counsel "to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690 (1984); *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011). In order to establish ineffective assistance of trial counsel, an appellant must prove that (1) trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687–89; *Hernandez v. State*, 726 S.W.2d 53, 54–57 (Tex. Crim. App. 1986).

The prejudice prong requires a showing that, but for counsel's errors, there was a reasonable probability that the result of the proceedings would have been different. *Hernandez*, 726 S.W.2d at 55. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* "If the deficient performance might have affected a guilty verdict, 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018) (quoting *Strickland*, 466 U.S. at 695).

*Standard of review*

In assessing a claim of ineffective assistance, an appellate court "must indulge a strong presumption that counsel's conduct [fell] within the wide range of

reasonable professional assistance; that is, the [appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (citing *Strickland*, 466 U.S. at 689).

Under *Strickland*'s first prong, we review counsel's performance by considering the totality of the circumstances as they existed at the time of trial, without the benefit of hindsight and without relying only on isolated circumstances at trial. *See Ex parte Flores*, 387 S.W.3d 626, 633–34 (Tex. Crim. App. 2012). Ordinarily, this Court will not find an attorney ineffective in the absence of a record of his rationale if there is any plausible strategic reason for his action or inaction. *See Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013).

With respect to the prejudice prong, "appellate courts must show almost total deference to a trial court's findings of historical fact as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Bazan v. State*, 403 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). We examine the totality of the evidence before the jury to determine whether, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *See Martinez,* 330 S.W.3d at 900.

An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong. *Garcia,* 57 S.W.3d at 440 (citing *Strickland*, 466 U.S. at 697); *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

–17–

*Admissibility of statements made as a result of custodial interrogation*

The Texas Code of Criminal Procedure establishes procedural safeguards for securing the privilege against self-incrimination. TEX. CODE CRIM. PROC. art. 38.22. The Code provides that no oral statement of an accused made as a result of a custodial interrogation shall be admissible against the accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. *Id.* art. 38.22 § 3. A defendant's statement may be used against him only "if it appears that the same was freely and voluntarily made without compulsion or persuasion." *Id.* art 38.21.

The determination whether a statement is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). A statement may be involuntary under article 38.21 or 38.22 even in the absence of police misconduct:

> A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary under Article 38.21 and the Texas confession statute. . . . As Professor Dix has noted, "evidence of a defendant's psychological abnormality" (such as [a defendant's] evidence of hallucinations and following God's command) "has its full logical relevance" under Texas law.
>
> Under Articles 38.21 and 38.22 and their predecessors, fact scenarios that can raise a state-law claim of involuntariness (even though they do not raise a federal constitutional claim) include the following: (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have "knowingly, intelligently and voluntarily" waived his rights; (3) the suspect "lacked the mental capacity to understand his rights";

–18–

(4) the suspect was intoxicated, and he "did not know what he was signing and thought it was an accident report"; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into "for questioning by several persons armed 'with six-shooters.'"

*Oursbourn v. State*, 259 S.W.3d 159, 172–73 (Tex. Crim. App. 2008) (footnotes omitted) (holding that where defendant claimed he was bipolar and in a depressed or manic state and thus unable to effectively waive his rights, the issue of voluntariness should have been submitted to the jury); *see also Lopez v. State*, 610 S.W.3d 487, 495 (Tex. Crim. App. 2020) (involuntariness claims can "involve 'sweeping inquiries into the state of mind of a criminal defendant who has confessed'") (quoting *Oursbourn*, 259 S.W.3d at 172). A trial judge may "raise[ ] on his own an issue about the voluntariness of a confession," or a party may notify the trial judge of an issue. *Oursbourn*, 259 S.W.3d at 175.

### Appellant did not establish that counsel was ineffective

"[W]hen counsel's actions or omissions may have been based upon tactical decisions, but the record contains no specific explanation for counsel's decisions," an appellate court may not reverse a conviction based on ineffective assistance of counsel. *Bone v. State*, 77 S.W.3d 828, 830 (Tex. Crim. App. 2002). The record does not reveal either counsel's decisions or the reasons for them.

The record reflects that Appellant's counsel filed a "Motion for Examination Regarding Insanity" on June 7, 2016, the motion was set for hearing on June 10, 2016, and on that date, the trial court signed an order appointing an expert to

determine Appellant's competence to stand trial. In an order dated July 8, 2016, the trial court found Appellant incompetent to stand trial. The record also reflects the following: on June 20, 2017, the trial court heard and granted the State's motion for an insanity evaluation,[3] and experts were appointed for that purpose; the trial court signed a "Judgment of Competency" on September 6, 2019, that referenced an August 27, 2017 report by a court-appointed expert, but the report is not included in the record; the State designated numerous experts to testify regarding Appellant's mental health, but these witnesses were not called at trial; and Appellant's mental health records from two facilities were introduced into evidence at trial, but the appellate record does not include the evaluations of competency or insanity ordered by the trial court. Consequently, the record reflects that the parties and the trial court devoted time and resources to considering Appellant's competency and mental health, but the record lacks any information for our review regarding counsel's decisions on the subject, the reasons for those decisions, or the data counsel considered in making them.

For purposes of our analysis, we assume without deciding that Appellant's counsel could have sought the statement's exclusion on the ground that it was not voluntarily made. *See* TEX. CODE CRIM. PROC. art. 38.21. If counsel had moved to

---

[3] The reporter's record from this hearing reflects a statement by the trial judge that "Mr. Sample has been returned to this court, having been declared to be competent by the appropriate state agency and its employees. Therefore, the State has moved for an insanity evaluation." Appellant's counsel clarified, "So the record is clear, the State's asking Dr. Pittman to first re-evaluate the competency and then do the insanity. I think they're just trying to be ultra careful. So I want to make sure the record is clear."

suppress the statement, we would review the trial court's ruling under a bifurcated standard, giving almost total deference to the trial court's findings of fact that are supported by the record and to mixed questions of law and fact that turn on an assessment of a witness's credibility and demeanor. *See, e.g., Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We would review de novo any application of law to fact questions that did not turn on the witnesses' credibility and demeanor. *Id.*

Here, where at least part of the trial court's decision would have been based on Appellant's credibility and demeanor—and in light of the court's earlier finding that Appellant was competent to stand trial—we cannot conclude there is a reasonable probability the trial court would have granted a motion to suppress, or, if it had, the jury would have had a reasonable doubt respecting Appellant's guilt. *See id.*; *see also Martinez*, 330 S.W.3d at 900–01 (inquiry for ineffective assistance claim is whether, but for counsel's unprofessional errors, there is a reasonable probability the proceeding's result would have been different).

State's Exhibit 9, Appellant's videotaped interview, provided the jury with its only opportunity to hear, firsthand, Appellant's unwavering denials that he had anything to do with Tubb's death. Appellant confessed nothing, and equally important, denied incriminating statements made by other witnesses, giving the jury both an alternate explanation of Appellant's actions and Appellant's point of view without the danger of subjecting Appellant to cross-examination. The interview

provided some evidence to support a verdict of not guilty that the record otherwise lacked. Consequently, Appellant's counsel could have made the tactical decision not to object to admission of the statement into evidence. We note that Appellant's counsel did object to admission of a portion of the interview that occurred after Appellant invoked his right to counsel, the State agreed to cut that portion of the interview from the portion played for the jury, and the jury did not hear it.

In closing argument, Appellant's counsel encouraged the jury to listen to the interview and compare it to Ronnie's videotaped interviews with the police. Although counsel said that Appellant's interview was "all over the place," he argued that in comparison to Ronnie's recorded interviews, Ronnie was far less credible. Counsel argued that Appellant's interview "shows how he was behaving, how he was thinking, and what was going on." Later, counsel argued Appellant's statements that he was "on vacation" instead of fired from his job were the result of embarrassment, not deliberate falsehoods, "[b]ecause here's a guy who's had a job and worked his entire life. And yeah, look at his interview, because he will tell you, job is important. That tells you what his mindset is." Counsel also rebutted the State's contention that in the interview, Appellant immediately turned against his son and other witnesses when confronted with their statements:

> [L]ook at it [the video of Appellant's interview]. Because y'all are going to better be able to watch and see how is that transition and what's going on there and what is happening in the statements. But I tell you, irregardless [sic] of what his relationship is, as Jacob Sample explained it, listen to [Appellant] when he talks about his son. He says, You know,

he graduates from UTD, he's got this, he's doing all these things. You can obviously tell that it's pride in his son. And then all of a sudden, they say, Oh, no, now he's saying that. He doesn't say that he's a liar. He just says, Jacob never said that, Jacob never said that. Watch the video and you will know.

Further, Appellant's counsel could have had other reasons for his actions not apparent from the record. As explained in *Bone*, "[u]nder *Strickland*, the defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act and omission." *Bone*, 77 S.W.3d at 836. Appellant failed to meet this burden. Here, as in *Bone*, counsel should be "accorded an opportunity to explain [his] actions before being condemned as unprofessional and incompetent." *Id.* We decide Appellant's first issue against him.

## Issue 2: Sufficiency of the Evidence

Appellant argues that "[t]he evidence the State presented to link Appellant to the death of Tommey Tubb is purely circumstantial and paltry, in the best light"; that there was no direct evidence of Appellant's involvement in Tubb's death; and that the State relied heavily on Ronnie's testimony when Ronnie was not credible. He concludes that "the evidence is insufficient to find that Appellant committed murder, as charged in the indictment, beyond a reasonable doubt."

### *Murder*

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1). Use of a deadly weapon raises an inference of intent. *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012)

–23–

(specific intent to kill may be inferred from use of deadly weapon). A firearm is a deadly weapon. TEX. PENAL CODE § 1.07(a)(17)(A) (definition of deadly weapon).

*Standard of review*

We evaluate a challenge to the sufficiency of the evidence under the standards established in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95. This standard of review for legal sufficiency is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Circumstantial evidence is considered as probative as direct evidence and is sufficient, standing alone, to establish a defendant's guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

We defer to the trier of fact's resolution of any conflicting inferences that are raised in the evidence and presume that the trier of fact, in this case the jury, resolved such conflicts in favor of the prosecution. *Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 894; *Sennett v. State*, 406 S.W.3d 661, 666 (Tex. App.—Eastland 2013, no pet.). We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 895. The State need not disprove all reasonable

alternative hypotheses that are inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Rather, we consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13.

Reversal on evidentiary sufficiency grounds is restricted to "the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *see Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"). In other words, the appellate scales are weighted in favor of upholding a trial court's judgment of conviction. *Winfrey v. State*, 323 S.W.3d 875, 879 (Tex. Crim. App. 2010).

### The evidence was sufficient

As Appellant argues, "[t]his is a purely circumstantial evidence case." The State offered neither direct testimony nor forensic evidence linking Appellant to the murder. Appellant argues that law enforcement's immediate focus on Appellant as the suspect resulted in the failure to verify Ronnie's alibis, a two-year delay in testing the swabs taken from Ronnie's hands, and the other mistakes—admitted by the officers who testified—in the investigation. He argues that Ronnie's interviews were "vastly different . . . on substantive, factual issues," and that Ronnie, "the man with gunshot residue on his hands," "changes his story so drastically that no reasonable jury could have found him to be credible." He further argues:

- Ronnie made the 911 call, was the only person at the crime scene, was standing over a man killed by a gunshot wound to the head, had gunshot residue on his hands, and gave a statement implicating his brother;

- Law enforcement never investigated Ronnie's alibi, took two years to test swabs of Ronnie's hands, and never pursued any other possible avenues of investigation;

- Expert testimony established there was no gunshot residue on Tubb's skin;

- Langran's testimony about the timing and substance of Ronnie's phone call to him was inconsistent with Ronnie's testimony;

- There is no physical evidence tying him to the murder; Tubb's DNA was not found on any of Appellant's clothes or personal effects when he was taken into custody and no tests were made for Ronnie's DNA at the scene;

- Searches of Appellant's residence and vehicle never recovered any shells or cartridges for a .22 caliber firearm;

- The State's contention that Appellant "spiraled out of control" from his long-term use of hydrocodone combined with loss of his job and his girlfriend "doesn't make logical sense," because the breakup with Northcutt occurred months before the murder; he had "been able to hold down a job and maintain relationships" despite his hydrocodone use, and his behavior at the Langrans' home after he lost his job was "strange and unusual" but not violent, threatening, or aggressive;

- According to expert testimony presented at trial, data from Appellant's cell phone did not support either Ronnie's story that Appellant called him at noon on the day of the murder or Jacob's and Northcutt's testimony of their telephone conversations with Appellant;

- Every family member who testified was biased in favor of Ronnie and against Appellant;

- When Appellant complained that people were stealing from him, he did not mention Tubb; and

- Appellant's allegedly incriminating statements were too vague to support anything other than a suspicion of his guilt.

Appellant made all of these arguments to the jury at trial. The State relied on evidence, detailed above, that:

- Appellant was on the premises after the murder occurred;

- Tubb died as a result of being shot in the head with a .22 caliber firearm, and Appellant had a .22 caliber firearm;

- Appellant called his stepfather to ask, "in so many words, What do you do with a dead critter? I've got a—what do I do with it?";

- On the same night, Appellant drove to his mother and stepfather's home and told his stepfather, "I've done a bad thing," then drove off when his stepfather told him to "go turn yourself in";

- Appellant told his son Jacob that he had been around when "somebody got shot" and he didn't know how it happened;

- Appellant told Northcutt that he "handled" the problem of the person stealing from him; and

- Appellant told Brock he acted in self-defense because his property had been taken and his credit cards had been "maxed out."

The State characterizes Appellant's statements to Langran, Jacob, Northcutt, and Brock as "four separate confessions to this murder," and also argues that "Appellant had motive, opportunity, and fled the scene of the crime." The State contends that Appellant's motive was his belief that Tubb was stealing from him, and notes that Appellant was alone with Tubb at the scene during the day. And to explain the gunshot residue evidence, the State argued to the jury that Ronnie had touched Tubb's body as well as the carpet and tarp wrapped around it. Although the State concedes that "this case was not well investigated," the State also argues that

the evidence, taken in the light most favorable to the jury's verdict, is legally sufficient to support Appellant's conviction.

Reviewing all of the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that Appellant intentionally or knowingly caused Tubb's death by use of a firearm, a deadly weapon, beyond a reasonable doubt. *See* TEX. PENAL CODE § 19.02(b)(1); *Cavazos*, 382 S.W.3d at 384; TEX. PENAL CODE § 1.07(a)(17)(A); *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95. Although as the State argues, "th[e] evidence was certainly there for the jury to consider [Ronnie] as a possible suspect," the State was not required to disprove all reasonable alternative hypotheses inconsistent with appellant's guilt. *See Wise*, 364 S.W.3d at 903. Given the jury's verdict, we must defer to the jury's resolution of any conflicting inferences that are raised by the evidence and presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 894; *Sennett*, 406 S.W.3d at 666. It was within the jury's province to decide whether Appellant's or the State's evidence was more credible in light of all of the evidence presented, and whether the State met its burden of establishing that Appellant intentionally or knowingly caused Tubb's death beyond a reasonable doubt. *See* TEX. PENAL CODE § 19.02(b)(1); *Cavazos*, 382 S.W.3d at 384. We conclude there was sufficient evidence to support the jury's verdict. We decide Appellant's second issue against him.

## Issue 3: Exclusion of Impeachment Evidence

In his third issue, Appellant contends the trial court erroneously excluded evidence bearing on Ronnie's credibility.

### *Standard of review*

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.* We may not substitute our own decision for that of the trial court. *Id.*

### *Exclusion of evidence*

"Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement." TEX. R. EVID. 613(a)(4). When examining a witness about the witness's prior inconsistent statement, a party must first tell the witness (1) the contents of the statement, (2) the time and place of the statement, and (3) the person to whom the witness made the statement. TEX. R. EVID. 613(a)(1). The witness must be given the opportunity to explain or deny the prior inconsistent statement. TEX. R. EVID. 613(a)(3). "The rule of admissibility of evidence of prior inconsistent statements should be liberally construed and the trial judge should have discretion to receive any evidence which gives promise of

exposing a falsehood." *Aranda v. State*, 736 S.W.2d 702, 707 (Tex. Crim. App. 1987).

"A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and," if the ruling excludes evidence, the party "informs the court of its substance by an offer of proof, unless the substance was apparent from the context." TEX. R. EVID. 103(a)(2); *see also Mays v. State*, 285 S.W.3d 884, 889–90 (Tex. Crim. App. 2009) (citing rule 103). "Absent a showing of what [the excluded] testimony would have been, or an offer of a statement concerning what the excluded evidence would show, nothing is presented for review." *Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999).

***The trial court did not err by excluding the evidence***

Appellant invites the Court to watch State's Exhibits 120 and 121, videotaped interviews of Ronnie, "to see just how inconsistent Ronnie Sample's two statements are." Appellant argues,

> For the trial court to not allow Appellant to adequately cross-examine [Ronnie], the State's star witness and Appellant's prime suspect in the murder, was to hog tie Appellant's defense and to prevent him from fully and fairly exploring the inconsistencies in the statement of the person who first pointed the finger at Appellant, and who, by virtue of being the only person to have physical evidence linking him to the murder, had the most to gain by insuring that Appellant was convicted for this crime.

More specifically, Appellant first argues that Ronnie made inconsistent statements about the location of a shotgun (not the murder weapon). He contends that Ronnie initially told law enforcement that Appellant left the house with the

–30–

shotgun and that the shotgun was not at the house, but that Ronnie later found the shotgun at Appellant's house but failed to tell law enforcement. Apparently reviewing a written transcript of one of Ronnie's interviews that is not included in the appellate record, the trial court ruled:

> THE COURT: All right. That's not an inconsistent statement. He never said he took it. He said it's either in his truck or he took it. That's not—
>
> MR. BROOKS [Defense counsel]: Judge, I think the first of that transcript, he had it.
>
> THE COURT: All right. And the witness has testified, hasn't he, that he later found it in the defendant's house?
>
> MR. BROOKS: True.
>
> THE COURT: Okay. So, I mean, again, I understand—let me say that I—just so—because it looks like we're going to do this—and that's fine—more than one time—that an inconsistent statement can either be inconsistent because it's directly inconsistent or because it holds the promise of exposing falsehood. And again, I don't see any falsehood— he said I went in there and I didn't see it, then he makes a speculation as to where it might be. He never said this is where it is. He said it's not in there so it must be over here or over here. So that's not inconsistent and does not hold the promise of exposing falsehood. Yes, sir.
>
> MR. BROOKS: Goes to the June—Judge, if you remember I asked that question there because that is some post time, and the question the officer's deputy—Lieutenant Seals, excuse me, is again—the same reference is that he's—and I think not telling the law enforcement that he's recovered the shotgun is what we're talking about there.
>
> THE COURT: I disagree. So I understand what you want to ask, but I'll sustain the objection to it and I'm not going to allow it. Again, I don't find it to be inconsistent or reasonably likely to expose a falsehood.

Appellant next complains about alleged inconsistencies in Ronnie's testimony regarding a fight between Ronnie and Appellant and the sequence of events on the

day of the murder, and quotes the portion of the record where counsel discussed the matter with the trial court. The court ruled (1) the difference between the statements, "I'll cut you" and "I'll gut you" were not "sufficiently different to allow you to impeach him on that," (2) Ronnie had already admitted that if there was an inconsistency in his testimony about "put[ting] the knife up," then "it was a mistake," (3) the statements whether either Appellant or Ronnie—the record is not clear which—"touched" the other or whether he "grabbed" him were not inconsistent, and in any event, counsel had already questioned Ronnie on the subject, "and I don't believe that further questioning would be likely to result in the discovery or a fabrication or falsehood"; and (4) Ronnie's statements about his observations of blood on a chair were too vague; the court explained, "I don't think he made a clear enough statement that he can now be impeached with it."

The court did rule, however, that Ronnie could be impeached on (1) his prior statement that he had already taken the mattresses to the trash trailer, contrasted with his later "clear statement [that] those mattresses were on the porch," and (2) statements that he did—and did not—enter the house before his argument with Appellant. After further argument, the State indicated it had no objection to either of those rulings.

We conclude that the trial court did not abuse its discretion in denying further cross-examination of Ronnie on the prior statements in question. As the trial court explained, in each case Ronnie had admitted the inconsistency, or the statements

–32–

were not inconsistent, or the statements were not likely to expose a fabrication or falsehood. *See* TEX. R. EVID. 613(a); *Aranda*, 736 S.W.2d at 707. The record reflects that the trial court considered each complaint under the applicable standards in its rulings either admitting or excluding the evidence. *See Aranda*, 736 S.W.2d at 707.

We also note that the record contains no offer of proof or bill of exceptions in the trial court to support Appellant's more general complaint in his third issue that Ronnie's "statements are so different as to bear almost no likeness to one another." Because this general complaint does not identify the substance of the allegedly erroneously-excluded evidence, it presents nothing for our review. *See Guidry*, 9 S.W.3d at 153.

Further, the videos of both of Ronnie's interviews, marked as State's Exhibits 120 and 121, were identified and admitted into evidence without objection during the State's presentation of its case. Consequently, both interviews in their entirety were available to the jury during their deliberations.[4] *See Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.) ("Any error in excluding evidence is harmless if the same evidence is subsequently admitted without objection.").

---

[4] The record reflects that during deliberations, the trial court stated that the jury "asked for some evidence that's been maintained in digital format" and the trial court granted the request without objection from either party. The jury's note is not included in the appellate record, and the court's instructions to the jury on the matter do not include specific exhibit numbers. Consequently, we cannot determine whether or not the jury's request was for Ronnie's interviews.

During closing argument, Appellant's counsel identified Ronnie's two interviews by date and encouraged the jury, multiple times, to watch them:

> [W]e have two videos of Ronnie Sample that come to you that are in evidence, that you can take right back into that room and listen to them. And I'm sorry, they're long. We've got one from May 20th–21st 2016, and one from June of 2018. And I think those interviews are very significant . . . .
>
> Watch [the 2016] video. Watch that video . . . .

Later, counsel argued:

> Watch the video, the [2018] interview between Ronnie and [Officer] Roger Seals. Watch that interview because it's got, like, detail you've never even heard of when you look back into May 2016. And as you look at that video, I want you to watch because, you know, part of that point is what's happened there is all of a sudden now, two years later, uh-oh, the GSR [gun shot residue] kit's back and guess who has GSR on their hands. Ronnie.

In his argument, counsel highlighted specific discrepancies for the jury to consider when watching Ronnie's interviews, including some of the specific matters Appellant raises on appeal, such as the shotgun's location and Ronnie's failure in the first interview to mention that he had a fight with Appellant during which Appellant attempted to pull a gun. The interviews in their entirety were available for the jury to consider during deliberations. For this additional reason, the trial court did not err in its rulings. *See Khoshayand*, 179 S.W.3d at 784. We decide Appellant's third issue against him.

## CONCLUSION

The trial court's judgment is affirmed.

191254f.u05

/Leslie Osborne//
LESLIE OSBORNE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ALLEN THOMAS SAMPLE,
Appellant

No. 05-19-01254-CR  V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th District
Court, Hunt County, Texas
Trial Court Cause No. 31279.
Opinion delivered by Justice
Osborne. Justices Myers and Carlyle
participating.

  Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered this 19th day of July, 2021.